IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-01728-PAB-MJW

FRANCISCO ALTAMIRANO,

     Plaintiff,

v.

CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD,

     Defendant.

---

### ORDER

---

     This matter is before the Court on the Motion for Summary Judgment [Docket No. 108] filed by defendant the Chemical Safety and Hazard Investigation Board ("CSB"); Plaintiff's Motion to Strike Material Filed in Support of Defendant's Motion for Summary Judgment [Docket No. 124] filed by plaintiff Francisco Altamirano; and Plaintiff's Motion to Strike New Arguments Contained in Defendant's Reply in Support of Motion for Summary Judgment; or, in the Alternative, Motion for Leave to File Surreply Brief [Docket No. 126]. This case arises out of the termination of Mr. Altamirano's employment by the CSB.

## I. BACKGROUND

     The following facts are undisputed unless otherwise indicated. Plaintiff is "Hispanic or Latino" and was born on January 29, 1954. Docket No. 116 at 10, ¶ 12; Docket No. 125 at 5. The CSB is a federal agency that investigates chemical accidents. Docket No. 108 at 2, ¶ 1; Docket No. 116 at 1, ¶ 1. The CSB employs

Chemical Incident Investigators to travel to and investigate accident sites.  *Id*.  As of the

filing of defendant's motion for summary judgment, the CSB had forty-one employees.

Docket No. 108 at 2, ¶ 1; Docket No. 116 at 1, ¶ 1.  Plaintiff was employed as a

Chemical Incident Investigator from July 2002 through November 2009.  Docket No.

108 at 2, ¶ 2; Docket No. 116 at 1, ¶ 2.  His responsibilities included traveling to

accident sites, interviewing witnesses, gathering evidence, and writing reports.  *Id*.

On July 16, 2002, plaintiff was issued a government travel charge card through

Citibank to cover his work-related travel expenses.[1]  Docket No. 108 at 2, ¶ 3; Docket

No. 116 at 1, ¶ 3.  Government travel charge cards must be used for "expenses directly

related to [] official travel" and may not be used "for personal reasons while on official

travel."  41 C.F.R. §§ 301-51.6, 51.7.  Plaintiff did not read the "set-up form" that he

signed when he received his SP1 card because he was "pressed for time."  Docket No.

116 at 12, ¶ 20; Docket No. 125 at 5.  He participated in an ethics training in 2007

which listed, as one of the first three employee responsibilities, "[p]ay all charges by the

statement due date, regardless of reimbursement by the agency."   Docket No. 108 at

15, ¶ 79(g); Docket No. 116 at 7, ¶ 79(g); Docket No. 108-25 at 1, ¶ 6; Docket No. 108-

25 at 42.  He watched a "Travel Refresher 2008" presentation in April 2008, but was

"dog tired" at the time and "therefore did not pay attention to the materials in those

slides."  Docket No. 116 at 12, ¶ 20; Docket No. 125 at 5.  Plaintiff testified at an

administrative hearing that, in the first six months of his employment with the CSB, a

---

[1]The government travel charge card program was known as Smart Pay 1 ("SP1")
from July 2002 through December 2008, when its name was changed to Smart Pay 2
("SP2").  Docket No. 108 at 3, ¶¶ 4-5; Docket No. 116 at 1, ¶¶ 4-5.

senior investigator named John Murphy told him that, with respect to the travel charge card, "[a]s long as you pay the bill, Cisco, you're responsible to pay the bill, everything would be okay." Docket No. 116-3 at 10 (Altamirano testimony at Merit Systems Protection Board ("MSPB") hearing, at 188, l.15 to 189, l.25).[2]

Anna Brown is the CSB's Director of Administration. Docket No. 108 at 3, ¶ 8; Docket No. 116 at 2, ¶ 8. Since September 29, 2006, Ms. Brown has overseen the CSB's government travel charge card program. Docket No. 108 at 3, ¶ 9; Docket No. 116 at 2, ¶ 9; Docket No. 125 at 2, ¶ 9. On October 1, 2006, the CSB became a customer of the Bureau of Public Debt ("BPD") with respect to the travel charge card program. Docket No. 108 at 3, ¶ 10; Docket No. 116 at 2, ¶ 10; Docket No. 108-4 at 4-5 (Pamela Enlow dep., at 44, l.21 to 45, l.22). On March 4, 2009, the BPD sent Ms. Brown a report for delinquent SP2 cardholders, which included plaintiff. Docket No. 108 at 3, ¶ 11; Docket No. 116 at 2, ¶ 11; *see* Docket No. 125-1 at 2-3. On March 9, 2009, the BPD sent Ms. Brown a report for delinquent SP1 cardholders, which included plaintiff. Docket No. 108 at 3, ¶ 13; Docket No. 116 at 2, ¶ 13. Plaintiff was the only employee listed on both the March 4 and March 9 spreadsheets, Docket No. 108 at 4, ¶ 14; Docket No. 116 at 2, ¶ 14, and had the highest current balance due on both spreadsheets. Docket No. 108 at 4, ¶ 15; Docket No. 116 at 2, ¶ 15. On the March 4, 2009 spreadsheet, plaintiff's current balance was $4,916.29 ($908.56 of which was thirty days past due) and the next highest balance was $1,049.76. Docket No. 125-1 at

---

[2]Defendant argues that this statement is inadmissible hearsay. Docket No. 125 at 6, ¶ 17. However, the statement is admissible to prove its effect on plaintiff. *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993).

2.  On the March 9, 2009 spreadsheet, plaintiff's current balance was $3,949.55 ($3,498.55 of which was ninety days past due).  The only other balance listed was $403.13 for another individual.  Docket No. 108-6 at 2.  Plaintiff incurred the charges listed in the delinquency report during the second half of 2008 and the first two months of 2009.  Docket No. 116 at 12, ¶ 19; Docket No. 125 at 5.

After receiving the spreadsheets, Ms. Brown requested transaction data from BPD itemizing plaintiff's charges.  Docket No. 108 at 4, ¶ 16; Docket No. 116 at 2, ¶ 16; *see also* Docket No. 116-1 at 4 (Brown testimony at MSPB hearing, at 100, ll.15-19) ("I contacted Bureau of Public Debt myself to find out exactly why both accounts were late and asked for detail listing of all of the transactions for the SP1 and the SP2 card for Mr. Altamirano.").  On March 10, 2009, BPD sent Ms. Brown "itemized transaction details for Plaintiff's SP1 account from September 2005 through November 2008."[3] Docket No. 108-1 at 2, ¶ 10.  Docket No. 108-7.  On March 12, 2009, BPD sent Ms. Brown "itemized transaction details for plaintiff's SP2 account for the period running from December 2008 through February 2009."  Docket No. 108-1 at 2, ¶ 11.  Ms. Brown reviewed the itemized transaction details with Elizabeth Robinson, CSB's Director of Financial Operations, and noticed that there were charges that did not appear to be

---

[3]Plaintiff denies this fact on the basis that "Ms. Brown's statement about the 'itemized transaction details' . . . does not meet the requirements of Fed. R. Civ. P. 56(c)(4)."  Docket No. 116 at 2, ¶¶ 18-19.  Rule 56 states that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4). Plaintiff does not explain why Ms. Brown's statement, which is based on her personal knowledge of the information that she received from BPD, does not meet the requirements of this rule.  Plaintiff does not offer any evidence contradicting this statement.  Accordingly, plaintiff has not raised a genuine dispute of fact on this point.

connected with work-related travel.  Docket No. 108 at 4-5, ¶¶ 21-22; Docket No. 116 at 2-3, ¶¶ 21-22.  Ms. Brown informed John Lau, CSB's Director of Human Resources, of the unusual charges.  Docket No. 108 at 5, ¶¶ 23-24; Docket No. 116 at 3, ¶¶ 23-24.

On March 19, 2009, plaintiff was put on administrative leave.  Docket No. 108-21 at 1.  In March 2009, the CSB contracted with Marilyn Mattingly, a private investigator, to investigate plaintiff's use of his travel charge card.  Docket No. 108 at 5, ¶¶ 29-30; Docket No. 116 at 3, ¶¶ 29-30.  On April 17, 2009, Mr. Lau requested a copy of Ms. Mattingly's draft findings and, on April 23, 2009, he sent her comments on the draft. Docket No. 116-10.  In those comments, Mr. Lau (1) pointed out several typos in the draft; (2) noted that evidentiary citations were missing; (3) suggested a change to the formatting; (4) informed Ms. Mattingly that SP1 and SP2 cards carry a facial warning that they are only intended for government use; (5) informed Ms. Mattingly that there was no evidence that plaintiff had received a copy of the Cardholder Account Agreement at the time he signed the set-up form for his SP1 card; and (6) asked whether there was evidence regarding CSB employee knowledge of Administrative Resource Center travel policies.  *Id*. at 1-3.  Ms. Mattingly responded to Mr. Lau, thanking him for the comments and stating her intention to incorporate them into her final report.  *Id*. at 1.  Ms. Mattingly provided a final report to CSB in July 2009.  Docket No. 108 at 5, ¶ 32; Docket No. 116 at 3, ¶ 32.

At some point after plaintiff was put on leave, plaintiff's supervisor, Don Holmstrom, made a request to Mr. Lau that plaintiff's computer be searched for missing CSB investigative files and for evidence related to plaintiff's contention that he had been told by other employees that it was permissible to use a travel charge card for

non-work-related expenses.  Docket No. 108 at 7, ¶¶ 42-43; Docket No. 116 at 4,

¶¶ 42-43; *see also* Docket No. 108-16 at 2 (Lau dep., at 28, ll.10-18).  On May 4, 2009,

plaintiff told Mr. Holmstrom that the videos and photographs he had taken "during the

Silver Eagle tank 105 inspection" could be found on his camera memory stick or in his

camera bag.  Docket No. 116-14.  In June 2009, the CSB contracted with Sensei

Enterprises, Inc. ("Sensei") to conduct a forensic analysis of plaintiff's computer.

Docket No. 108 at 7, ¶ 45; Docket No. 116 at 4, ¶ 45.  On June 18, 2009, Mr. Lau

requested that Sensei "sort [plaintiff's] internet history for review by category of site" and

"look for evidence of any mass file deletions around" March 19, 2009.  Docket No. 116-

16 at 2.  Mr. Lau testified that, following the forensic analysis, he reviewed some of the

files from plaintiff's computer and found "sexually oriented, sexually explicit photos" and

a "sexually explicit email."  Docket No. 108-2 at 10 (Lau testimony at MSPB hearing, at

57, ll.3-25).  On August 21, 2009, Mr. Lau sent Ms. Robinson a Performance Work

Statement for computer forensic analysis to be performed by Sensei that refers to

"additional examination of laptop personal computer" and "additional investigative

support."  Docket No. 116-17 at 3.

Ms. Robinson also requested data from BPD regarding the travel card usage of

six employees other than plaintiff.  Docket No. 108-19 at 1, ¶ 2.  Ms. Robinson selected

the six other employees because they also appeared on the February 2009 delinquency

report.  *Id*. at ¶ 3.  Ms. Robinson compared the charge card data to records indicating

the dates of the employees' work-related travel during the period running from January

1, 2008 through March 13, 2009.  *Id*. at ¶¶ 5-6.  Ms. Robinson found that only one of

the six employees had used his or her card at a time when not on official travel,

spending $3.04 at a coffee shop.  *Id*. at 2, ¶ 7.

On July 10, 2009, Ms. Enlow, a BPD employee, sent Ms. Brown a spreadsheet containing detailed transaction information for the CSB delinquency reports dating back to January 2007; Ms. Brown forwarded the spreadsheet to Mr. Lau.  Docket No. 116 at 10, ¶ 13; Docket No. 125 at 6, ¶ 13.  Ms. Enlow's email states that the spreadsheet "provides the detail in the delinquency reports that [BPD has] provided to CSB since January 2007."  Docket No. 116-7 at 1.  Although Ms. Enlow later testified at her deposition that it was not BPD's policy to automatically send all delinquency information to the CSB, a factfinder drawing all reasonable inferences in favor of plaintiff could conclude, based on the text of the email, that the CSB had previously received the information in the spreadsheet.  *See* Docket No. 116-2 at 8 (Enlow dep., at 68, ll.6-21).  The spreadsheet lists delinquencies for twenty-three employees.  Docket No. 108-20; *see also* Docket No. 116 at 10-11, ¶ 15.  The individual identified as Male 6 was delinquent in his account payments seven times between January 2007 and July 2009; Male 6 has the largest number of delinquencies on the spreadsheet.  *See* Docket No. 108-20.  According to the spreadsheet, plaintiff's average past due balance was $1,985.76, which is three times higher than any other listed employee.  *See id*.  Plaintiff's accumulated past due balance for that time frame was $29,786.44, which is seven times higher than the employee with the next highest accumulated balance.  *See id*.

On July 29, 2009, Mr. Lau sent plaintiff a Proposal to Remove, recommending removal on the basis that plaintiff had used his government travel charge cards for

personal expenses, had failed to timely pay the charges, and had used his government-issued electronic equipment to send, receive, and view sexually explicit material. Docket No. 108-17.  Mr. Lau also found that plaintiff lacked candor insofar as plaintiff stated in an affidavit that he believed he was allowed to use his government travel charge card for personal expenses.  *Id*. at 6.

In preparing the Proposal to Remove, Mr. Lau relied on Ms. Robinson's finding that, in a review of other charge card usage, there was only one other incident of misuse, namely, the $3.04 charge at a coffee shop.  Docket No. 108 at 12, ¶ 68; Docket No. 116 at 6, ¶ 68.  At the time, the only late payments of which Mr. Lau was aware were those listed on the July 10, 2009 spreadsheet.  Docket No. 108 at 12, ¶ 69; Docket No. 116 at 6, ¶ 69; *see* Docket No. 108-20.  Mr. Lau was not aware of allegations that other CSB employees were sending, receiving, or storing sexually explicit material on government-issued electronic devices.  Docket No. 108 at 13, ¶ 71; Docket No. 116 at 6, ¶ 71.  The CSB had not previously searched anyone else's electronic equipment for such material.  Docket No. 116 at 6, ¶ 71; Docket No. 125 at 4.

Mr. Lau gave plaintiff a copy of the documentation supporting the Proposal to Remove.  Docket No. 108 at 13, ¶ 73; Docket No. 116 at 6, ¶ 73.  The Proposal to Remove stated that plaintiff could submit an oral or written response along with supporting evidence.  Docket No. 108 at 13, ¶ 74; Docket No. 116 at 6, ¶ 74.  Plaintiff responded, through his attorney, on September 4, 2009 and October 19, 2009.  Docket No. 108 at 13, ¶ 75; Docket No. 116 at 6, ¶ 75.  Plaintiff did not dispute that he made the identified charges using his government travel charge card on dates when he was not traveling for work.  Docket No. 108 at 13, ¶ 76; Docket No. 116 at 7, ¶ 76.  Plaintiff

did not dispute sending two sexually explicit emails, but denied inviting the receipt of the

other inappropriate sexual material found on his computer and cellular telephone.

Docket No. 108 at 13, ¶ 77; Docket No. 116 at 7, ¶ 77.

John Bresland, Chairman of the CSB, reviewed the Proposal to Remove and

asked Mr. Lau to address certain issues that plaintiff raised in response.  Docket No.

108 at 14, ¶ 79; Docket No. 116 at 7, ¶ 79; Docket No. 108-22 at 1, ¶ 4.  Mr. Lau

prepared an affidavit for Mr. Bresland addressing the following issues:

> (1)  Whether there was evidence that CSB employees are permitted to use their travel charge cards for non-work-related purchases: Mr. Lau stated that the practice is not allowed and submitted an affidavit from Ms. Robinson in support of this conclusion.  Docket No. 108-25 at 4 and Docket No. 108-26 at 1-4.

> (2)  Whether there was evidence that plaintiff invited the sexually explicit emails he received:  Mr. Lau stated that plaintiff explicitly invited these communications by asking a woman with whom he was corresponding to send him additional stories about herself and by signing up for an online personal service through his work account.  Docket No. 108-25 at 4-5.

> (3)  Whether there was evidence that another CSB employee told plaintiff in 2002 that he could use his travel card to pay for personal expenses as long as plaintiff paid the balance himself:  Mr. Lau stated that there was no evidence in the record that such a conversation had occurred and, if it had, there was evidence that plaintiff had since received information to the contrary through training sessions.  Docket No. 108-25 at 5-6.

> (4)  Whether there was evidence that plaintiff was specifically informed that there was a problem with his travel card before March 2009:  Mr. Lau stated that plaintiff had not previously been informed of any specific problems. Docket No. 108-25 at 7-8.

> (5)  Whether Citibank allows for a thirty-seven day grace period to pay off the balance on each statement:  Mr. Lau stated that Citibank does not.  Docket No. 108-25 at 8.

> (6)  Whether there was evidence that plaintiff invited individuals to send him the inappropriate photographs and videos found on his laptop:  Mr. Lau stated that plaintiff had affirmatively viewed or downloaded some of these

9

photographs and videos and that he had sent emails asking someone to send photographs of herself.  Docket No. 108-25 at 8.

(7)  Whether plaintiff participated in travel training at the CSB in 2006:  Mr. Lau stated that plaintiff had completed relevant training sessions in 2006, 2007, and 2008.  Docket No. 108-25 at 8-9.

In addition to the materials mentioned above, Mr. Bresland considered Mr. Lau's and Ms. Robinson's affidavits.  Docket No. 108-22 at 2, ¶ 6.

On November 16, 2009, Mr. Bresland issued a Removal Decision terminating plaintiff's employment.  Docket No. 108-21.  At the time, Mr. Bresland was aware of only one other misuse of a travel charge, namely, the $3.04 spent at a coffee shop, and was not aware of any other CSB employee who had used government-issued equipment to send, receive, solicit, or store inappropriate sexual material.  Docket No. 108-22 at 2, ¶¶ 9-10.

Plaintiff timely appealed his termination to the Merit System Protection Board ("MSPB").  *See Altamirano v. Chemical Safety Hazard Investigation Board,* 2010 WL 6742429 (Oct. 8, 2010).  On April 8, 2010, in connection with plaintiff's appeal, Ms. Brown reviewed archived records of travel card charges made by CSB employees before Ms. Brown took over the program in October 2006.  Docket No. 108 at 16, ¶ 89; Docket No. 116 at 8, ¶ 89.  Ms. Brown found the following documents: (1) a February 27, 2006 memorandum from Faye Spiers, a CSB employee who ran the travel card program before Ms. Brown, to an individual identified as Male 3, notifying Male 3 that his card had been placed in pre-suspension status because of his failure to make timely payments; (2) an email from the individual identified as Male 1 indicating that his card had been suspended by Citibank; (3) a July 25, 2005 memorandum from Ms. Spiers to

10

Male 1 stating that his travel card had been canceled; (4) an October 14, 2005 letter from Ms. Spiers to Citibank requesting that Male 1's travel card be reinstated.  Docket No. 108 at 16, ¶ 90; Docket No. 116 at 8, ¶ 90.  The July 2005 memorandum to Male 1 had been edited by Ms. Brown (under her maiden name, Anna Johnson) on July 1, 2005.  *See* Docket No. 116 at 8, ¶ 91; Docket No. 125 at 5, ¶ 91.  There is no direct evidence that Mr. Bresland or Mr. Lau were aware before April 2010 of the problems that Male 1 or Male 3 had with their travel charge cards.  Docket No. 108 at 17, ¶ 91; Docket No. 116 at 8, ¶ 91.  Ms. Robinson was not aware before April 2010 that Male 3 had problems with his travel charge card, but she was aware that Male 1 had problems because Ms. Spiers had mentioned the situation to her.  Docket No. 108-28 at 1-2, ¶¶ 1-2.  Both Male 1 and Male 3 are white.  Docket No. 116 at 10-11, ¶ 15; Docket No. 125 at 6, ¶ 15.  Male 1 was born in 1960, meaning that he was forty-five at the time his account was closed.  *Id*.  Male 3 was born in 1951, meaning that he was fifty-five at the time his account was placed in pre-suspension status.  *Id*.  The CSB did not request detailed transaction records from BPD for either Male 1 or Male 3.  Docket No. 116 at 9, ¶¶ 2-3; Docket No. 125 at 5.  At the administrative hearing, plaintiff testified that Male 1 had shown him "pictures" of "[s]emi-nude [and] nude women" on Male 1's government-issued laptop, but plaintiff did not testify that he told any other CSB employee about the pictures.  Docket No. 116-3 at 16 (Altamirano testimony at MSPB hearing, at 239, ll.12-25).  The CSB did not conduct a forensic analysis of Male 1's or Male 3's government-issued electronic equipment.  Docket No. 116 at 9, ¶¶ 5-6; Docket No. 125 at 5.

    At his deposition, plaintiff testified that he could not think of any action or comment on the part of Mr. Bresland, Mr. Lau, Ms. Robinson, Ms. Brown, Ms. Mattingly,

or any other CSB employee that reflected animus on the basis of race or national origin. Docket No. 108-24 at 2-6 (Altamirano dep., at 15, l.3 to 19, l.1).  Plaintiff testified that he heard a rumor that an older employee had been assigned to physical tasks beyond his capabilities as a way of forcing him out.  *See id*. at 6 (Altamirano dep., at 19, ll.15-25).

On October 8, 2010, after a two-day evidentiary hearing, an MSPB administrative law judge ("ALJ") found that the CSB had proved three of its four bases for termination by a preponderance of the evidence and that plaintiff had failed to prove his affirmative defenses of national origin and age discrimination by a preponderance of the evidence.  Docket No. 12-10 at 27.  The ALJ therefore denied plaintiff's appeal. Plaintiff appealed the ALJ's decision to the full MSPB, which issued a Final Order on June 1, 2011, affirming the ALJ.  *See* Altamirano v. Chemical Safety Hazard Investigation Board, Case No. DE-0752-10-0127-I-2 (June 1, 2011).[4]  On July 1, 2011, plaintiff filed this case, alleging that the CSB terminated him on the basis of his race and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., and on the basis of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA").  29 U.S.C. § 633a.  Plaintiff is also seeking judicial review of the MSPB's decision pursuant to 5 U.S.C. § 7703; plaintiff's administrative appeal will be addressed in a separate order.  *See* Docket No. 75.  On November 22, 2013, the CSB moved for summary judgment on plaintiff's discrimination

---

[4]This decision is available at:
http://www.mspb.gov/netsearch/viewdocs.aspx?docnumber=665681&version=667673&
application=ACROBAT.

claims.  Docket No. 108.

## II.  STANDARD OF REVIEW

An employee whose termination has been reviewed by the MSPB retains a right

to a trial de novo in a federal district court on claims brought pursuant to Title VII and

the ADEA.  5 U.S.C. § 7702(a)(1)(B)(i) and (e)(3).  According to Federal Rule of Civil

Procedure 56, a court "shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248-50 (1986).  In pursuing summary judgment, the moving party generally bears

the initial burden of showing the absence of a genuine dispute concerning a material

fact in the case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  However, "[w]hen,

as in this case, the moving party does not bear the ultimate burden of persuasion at

trial, it may satisfy its burden at the summary judgment stage by identifying a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim."

*Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving

party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of*

*Colorado, Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994) (citing

*Celotex,* 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations

in the pleadings, but instead must designate "specific facts showing that there is a

genuine issue for trial."  *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid

summary judgment, the nonmovant must establish, at a minimum, an inference of the

presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. However, to be clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson,* 477 U.S. at 248).

## III.  ANALYSIS

### A.  Motion to Strike Material Filed in Support of Summary Judgment

Plaintiff moves to strike a number of the exhibits that the CSB submitted in support of its motion for summary judgment. Docket No. 124. On summary judgment, a party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Court will consider each category of documents in turn.

#### 1.  Ms. Mattingly's Report

Plaintiff argues that Ms. Mattingly's report, Docket Nos. 108-12 to 108-15, is hearsay not within an exception to the rule. Docket No. 124 at 2, ¶ 6. The Court has not relied on this report or on any of the attached documents in ruling on the instant

motions and therefore plaintiff's request to strike this document is moot.

## 2. *Mr. Lau's October 8, 2009 Affidavit*

Plaintiff requests that the Court strike the affidavit that Mr. Lau prepared for Mr.

Bresland in October 2009 because it contains "statements that are not based on Mr.

Lau's personal knowledge." Docket No. 124 at 3, ¶ 7(b). Plaintiff does not identify

which statements in particular he is challenging. *See generally* Docket Nos. 124 and

129. Plaintiff does not dispute that Mr. Bresland reviewed this affidavit in the course of

making his decision. *See* Docket No. 129 at 4.

"[S]tatements offered for their effect on the listener are not hearsay." *United*

*States v. Smalls*, 605 F.3d 765, 786 n.18 (10th Cir. 2010). Mr. Bresland's state of mind

and the information available to him at the time he made his decision are material to

this case. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011).

This document is admissible to show Mr. Bresland's state of mind at the time he made

his decision.

Moreover, the Court has reviewed Mr. Lau's affidavit and determined that the

only subjects about which Mr. Lau lacks personal knowledge are those supported by

Ms. Robinson's sworn affidavit. *See* Docket No. 108-25 at 4, ¶ 1 ("No such practice is

allowed. See attached affidavit of Ms. Elizabeth Robinson."); *id*. at 8, ¶ 5 ("No. See

attached affidavit of Ms. Elizabeth Robinson."). The Court cannot discern a valid basis

for plaintiff's objection to Mr. Lau's affidavit; thus, it is admissible to show the truth of the

matter asserted.

### 3. Mr. Bresland's Statement Regarding Other Employees' Travel Card Usage

Plaintiff argues that the Court should strike Mr. Bresland's statement that, "[a]t the time Mr. Altamirano was removed, the only misuse by a CSB employee of a government travel charge card of which I was aware was a charge of $3.04 made at Starbucks," Docket No. 108-22 at 2, ¶ 9, on the basis that it is not based on Mr. Bresland's personal knowledge. Docket No. 124 at 3, ¶ 8(e).

Mr. Bresland's statement indicates that *he himself was not aware* of any other misuse that may or may not have occurred, not that no other employees had in fact misused their cards. Accordingly, it falls within the scope of Mr. Bresland's personal knowledge and is admissible. Furthermore, plaintiff has introduced evidence that other employees did misuse their travel cards and that the CSB employees involved in investigating plaintiff's conduct were aware of these previous instances of misuse.

The Court has not relied on the remaining documents that plaintiff moves to strike and thus the motion is moot as to those documents. *See* Docket No. 124 at 3-6.

### B. Motion to Strike Arguments in Reply Brief

Plaintiff moves the Court to strike certain arguments advanced in defendant's reply brief or, in the alternative, to permit plaintiff to file a surreply on the basis that defendant's reply articulates arguments not set forth in its initial motion. Docket No. 126. Specifically, plaintiff argues that the following arguments are new: (1) plaintiff is not similarly situated to Males 1 and 3; (2) plaintiff is not similarly situated to any other of defendants' employees who appeared on the list defendant received in June 2009; and (3) plaintiff has not presented any evidence that defendant violated 5 C.F.R.

§ 752.404(g)(1).  Docket No. 126 at 1, ¶ 2.

"[R]eply briefs *reply* to arguments made in the response brief."  *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (emphasis in original).  "[W]here the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers–both briefs and affidavits–may properly address those issues."  *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 n.1 (7th Cir. 1996); *see also Guadagni v. New York City Transit Authority*, 387 F. App'x 124, 125-26 (2d Cir. 2010) ( "[R]eply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party.") (internal citation omitted); *Gates Corp. v. Dorman Products, Inc.*, No. 09-cv-02058-CMA-KLM, 2009 WL 4675099, at *2 (D. Colo. Dec. 7, 2009) (finding that arguments in a reply brief are not considered "new" where they respond directly to arguments raised in the response brief).

The three arguments that plaintiff seeks to strike respond directly to the three arguments that plaintiff raised in his response brief.  *Compare* Docket No. 116 at 15-20 *with* Docket No. 126 at 1, ¶ 2.  These arguments are not new because they rebut matters that plaintiff has put in issue.  *See Gates*, 2009 WL 4675099, at *2.  Since these rebuttal arguments are properly raised on reply, there is no basis for striking defendant's reply brief.  *See Beck*, 75 F.3d at 1134 n.1.

## C.  Discriminatory Termination

Plaintiff may prove both his Title VII and his ADEA claims indirectly, using the

*McDonnell Douglas* three-part burden-shifting framework.  *See Jones v. Okla. City Pub.*

*Schs.,* 617 F.3d 1273, 1278 (10th Cir. 2010); *Hysten v. Burlington N. & Santa Fe Ry.*

*Co.*, 296 F.3d 1177, 1180 (10th Cir. 2002); *see McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973).

At step one of the *McDonnell Douglas* inquiry, a plaintiff must establish a prima

facie case by showing that (1) he was a member of a protected class; (2) he was

qualified for his job and performing satisfactorily; (3) he was discharged despite his

qualifications; and (4) there is some additional evidence giving rise to an inference of

discrimination, for example, the position was not eliminated.  *Kendrick v. Penske*

*Transp. Servs. Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000) (citing *Perry v. Woodward*,

199 F.3d 1126, 1138 (10th Cir. 1999); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175

(10th Cir. 2004).  If the plaintiff succeeds in establishing a prima facie case, the burden

shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its

adverse employment action.  *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1321

(10th Cir. 2004).  If the defendant produces a legitimate reason, then the court must

grant the defendant summary judgment, unless the plaintiff can show a genuine issue

of material fact as to whether the stated reason for the adverse action is pretextual.  *Id*.

In this case, defendant does not dispute that plaintiff can establish a prima facie

case, *see* Docket No. 108 at 19, and plaintiff does not dispute that defendant has set

forth a legitimate non-discriminatory reason for his termination.  *See* Docket No. 116 at

14.[5]  Thus, the question before the Court is whether plaintiff has set forth sufficient facts

---

[5]In response to defendant's motion for summary judgment, plaintiff states that,
"[s]ince Defendant has articulated allegedly non-discriminatory reasons for its decision

to raise a genuine dispute of fact regarding whether defendant's stated reason is a pretext for discrimination.

A plaintiff may show pretext by demonstrating that there are "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's stated reason such that "a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996) (internal quotation marks omitted).

In assessing pretext, a court must "examine the facts as they appear *to the person making the decision*" instead of relying on the "plaintiff's subjective evaluation of the situation." *C.R. England, Inc.*, 644 F.3d at 1044 (internal citation omitted) (emphasis in original). The court's role is to prevent and redress employment

---

to terminate Plaintiff's employment, the question then is whether there exist genuine issues of material fact as to whether those reasons are a pretext for discrimination." Docket No. 116 at 14. In the reply brief in support of his motion to strike defendant's summary judgment exhibits, plaintiff seems to contradict this concession, arguing that defendant seeks to "reverse" the "well-established system of proof" applied in discrimination cases by asking the Court to "look at whether Plaintiff has presented pretext evidence concerning Defendant's allegedly non-discriminatory reasons for terminating Plaintiff's employment, rather than examining whether Defendant has presented admissible evidence in support of those reasons." *See* Docket No. 129 at 2-3. Plaintiff advanced this argument in response to defendant's contention that the Court need not resolve plaintiff's motion to strike exhibits because he has not created a genuine dispute of material fact regarding defendant's stated non-discriminatory reason for his termination. *See id*. at 1-2. Since the Court has resolved the motion to strike, any argument that defendant has failed to support its legitimate non-discriminatory reason for the termination must be measured by the evidence that was not stricken or ignored. The Court finds that the admissible evidence is sufficient to shift the burden to plaintiff to show that defendant's stated reason is a pretext.

discrimination, and not to act as a "'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006); (quoting *Jones v. Barnhart,* 349 F.3d 1260, 1267 (10th Cir. 2004)); *see also McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.").

For example, in *C.R. England*, the employer, a trucking company, stated that one reason it removed the plaintiff from his position as trainer was that he refused a load. 644 F.3d at 1043. The plaintiff did not deny refusing the load, but instead argued that his refusal was justified because he "was extremely frustrated with at least three load cancellations in a row." *Id*. at 1043-44. The court found that the plaintiff's explanation for his conduct did not demonstrate pretext because the "exercise of erroneous or even illogical business judgment does not constitute pretext." *Id*. at 1044.

### 1. *Male 1 and Male 3*

Plaintiff argues that pretext is evidenced by the fact that defendant requested a detailed transaction history for his travel card accounts and conducted a forensic analysis of his computer, but did not take similar steps to investigate Male 1 or Male 3. Docket No. 116 at 15-16. A plaintiff can demonstrate pretext by "providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. An employee is considered "similarly situated" if the employee "deals with the same

20

supervisor and is subject to the same standards governing work performance evaluation and discipline." *Id*. (internal citation omitted).

Plaintiff cites *Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800, 806 (6th Cir. 2007), and *Skar v. Spirit Aerosystems, Inc.*, 798 F. Supp. 2d 1204, 1210 (D. Kan. 2011), for the proposition that "failure to follow internal disciplinary procedures constitutes evidence of discrimination." *Talwar*, 258 F. App'x at 806.  However, in *Talwar*, the court found there was no evidence of discrimination because the plaintiff had failed to identify any similarly situated employees who were treated more favorably than he was. *Id*.

In *Skar*, the court found that the defendant's departure from its usual investigation process was not evidence of discrimination because (1) there was no evidence that the investigator had encountered a similar incident before; (2) the incident was unique in its seriousness; and (3) the record did not "reasonably suggest that [the investigator] is racially biased and that his bias affected either his report or investigation." 798 F. Supp. 2d at 1210.

Plaintiff argues that Male 1 and Male 3 are similarly situated employees who violated work rules of comparable seriousness because they also carried a balance of overdue payments on their travel card accounts, leading to the placement of Male 3's account in pre-suspension status and the cancellation of Male 1's account following two previous suspensions of his account.  Docket No. 116 at 15-16 (citing Docket No. 108-27 at 4, 7-8).  Plaintiff contends that Ms. Brown was aware of Male 1's account problems because she helped revise the memorandum that Ms. Spiers sent Male 1 in

July 2005.  Docket No. 116 at 15.  Plaintiff states that it is not credible that Mr. Lau, who has served as the Human Resources Director of the CSB since 2003, was unaware that one of the investigators was unable to travel for several months because his card was canceled or that another investigator had his account placed in pre-suspension status, especially since the CSB is a small agency.  *Id*. at 16.  Plaintiff does not contend that Mr. Bresland was aware of either Male 1 or Male 3 when making his decision to terminate plaintiff's employment.  *See id*.

The undisputed facts do not show that Male 1 or Male 3 committed violations of comparable severity to plaintiff's.  Male 1's travel card account was closed in 2005 because of an outstanding balance of $693.00 and two previous suspensions during the past twelve months.  Docket No. 108-27 at 7-9.  Male 3's account was placed in a pre-suspension status at the end of February 2006 because of an outstanding balance of $252.41.  Docket No. 108-27 at 4.  By comparison, in March 2009, plaintiff was thirty days late in paying $908.56 on his SP2 card and ninety days late in paying $3,498.55 on his SP1 card.  Docket Nos. 108-5 and 108-6.

Given the disparity in the past due balances carried by Male 1 and Male 3 as opposed to plaintiff, no reasonable factfinder could conclude that they committed comparably severe violations.  *See Kendrick*, 220 F.3d at 1232.  Furthermore, the fact that Ms. Robinson actively gathered additional data about delinquencies in the 2007 to 2009 time frame in order to compare plaintiff's card usage to that of other employees undermines any inference of pretext.  *See* Docket No. 108-20.

Plaintiff argues that he was treated differently than the employees listed on the July 10, 2009 spreadsheet.  Docket No. 116 at 17.  However, plaintiff cannot establish

22

that these employees committed similar violations because he was late in paying his SP1 bill on sixty-four out of eighty statements and late paying his SP2 bill on three out of six statements, while the highest number of late payments for a single individual on the July 2009 spreadsheet is seven. *See* Docket No. 108 at 7, ¶ 40; Docket No. 116 at 4, ¶ 40; Docket No. 116 at 11.  In addition, plaintiff has not introduced any evidence that the other employees carried balances similar in dollar value to plaintiff's.  In sum, plaintiff has not succeeded in raising an inference of pretext by showing that he was treated differently than other similarly situated employees who engaged in comparable misconduct.  *See Kendrick*, 220 F.3d at 1232; *see also Talwar*, 258 F. App'x at 806.

Finally, the Court notes that, although a reasonable factfinder could conclude that Mr. Murphy, a senior investigator at CSB, told plaintiff in 2002 that he could use his travel card for personal items as long as he paid off the balance, this does not create a genuine dispute of material fact regarding pretext.  Plaintiff's personal justifications for his actions are of no moment.  *See C.R. England*, 644 F.3d at 1044 ("we fail to see how [plaintiff's] excuse demonstrates pretext"); Docket No. 116 at 12, ¶ 17 ("Plaintiff interpreted [Mr. Murphy's] statement to mean that he could his SP1 card the same way he had used his Conoco corporate card.").  Plaintiff's explanations do not tend to show that Mr. Bresland acted in bad faith since there was evidence before him that plaintiff "was on notice multiple times after 2002 about the proper use of the government travel charge card."  Docket No. 108-25 at 5-6, ¶ 3.  Even if a juror found that plaintiff was sincerely mistaken or confused about the nature of the travel card program and that Mr. Bresland's decision was thus "erroneous" or "illogical" from a business perspective, there is no basis for finding that Mr. Bresland's stated reasons were mere pretext.  *See*

23

*C.R. England*, 644 F.3d at 1034.

### 2. *Computer Searches*

Plaintiff argues that defendant's stated reasons for conducting a forensic search of his government-issued electronic equipment[6] are implausible.  Docket No. 116 at 18. Specifically, plaintiff contends that: (1) it was unnecessary to search his email, text messages, or browser history to find investigative files since he demonstrated that he was willing to supply any missing files if asked directly; (2) it was unnecessary to search for an email regarding plaintiff's alleged 2002 conversation with Mr. Murphy since plaintiff never stated that the conversation occurred electronically; and (3) there was no evidence regarding his SP1 or SP2 charges on his computer.  Docket No. 116 at 18.  In addition, plaintiff argues that a reasonable juror could conclude that defendant contracted with Sensei to perform an additional search in August 2009 out of concern "about the adequacy of the[] other reasons for terminating Plaintiff's employment." Docket No. 116 at 18-19.

Defendant responds that plaintiff's arguments are irrelevant because Mr. Lau conducted the search of plaintiff's equipment, but was not the final decision-maker regarding his termination and because plaintiff's termination was not based solely on the material found on his computer.  Docket No. 125 at 9-10.

Plaintiff argues that the search of electronic equipment was unnecessary and thus discloses an ulterior motive on defendant's part.  Plaintiff's argument is based

---

[6]Defendant searched plaintiff's government-issued laptop computer, cellular telephone, digital voice recorder, digital camera, and email account.  Docket Nos. 116-15, 116-16, and 116-17.

largely on speculation and not on facts from which a reasonable juror could infer

pretext.  First, plaintiff relies on the fact that he responded to an inquiry regarding the

location of certain investigative files.  *See* Docket No. 116 at 13, ¶ 23.  However, there

is no evidence regarding the number or nature of the other files defendant was seeking.

Plaintiff's cooperation in a single instance does not permit an inference that defendant

had no need to locate other files that may have been stored on plaintiff's equipment.

Second, plaintiff argues that he never stated that his conversation with Mr. Murphy

occurred over email.  However, that does not suggest that defendant had no basis for

believing it might find information regarding plaintiff's view of the travel card program on

his electronic equipment.  Finally, plaintiff states that there was no information on his

computer regarding his travel card charges.  He does not, however, state that he

informed defendant of this fact or that defendant had any other reason to know that it

would not find travel card information on his electronic devices.  In sum, although a

reasonable juror could infer that the CSB did not have to search plaintiff's electronic

equipment in the course of its investigation, plaintiff has not offered facts from which a

reasonable juror could conclude that the decision to do so establishes pretext.

### 3.  *Violation of Federal Regulations*

Plaintiff argues that defendant violated federal regulations governing removal

decisions by soliciting additional information from Sensei after Mr. Lau completed the

Proposal to Remove and sent it to plaintiff.  Docket No. 116 at 19.  Plaintiff contends

that, "[e]ven if Defendant did not rely on that new information [in] its Decision to

Remove," a reasonable juror could infer that defendant's "failure to follow that

regulation is evidence that Defendant's proffered reasons for terminating Plaintiff's

employment are pretextual."  Docket No. 116 at 20.

Federal regulations provide that, in making a removal decision, a federal agency "will consider only the reasons specified in the notice of proposed action and any answer of the employee or his or her representative, or both."  5 C.F.R. § 752.404(g)(1).  "However, not every *ex parte* communication is a procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee and entitles the claimant to an entirely new administrative proceeding."  *Stone v. FDIC*, 179 F.3d 1368, 1376-77 (Fed. Cir. 1999).  "Only *ex parte* communications that introduce new and material information to the deciding official will violate the due process guarantee of notice."  *Id*.  When a due process violation has occurred, harmless error analysis does not apply and the matter must be remanded for another hearing.  *Id*.  Absent a due process violation, an employee must show that the agency has committed an error "in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error" in order to obtain reversal of the agency's decision.  *Ward v. United States Postal Serv.*, 634 F.3d 1274, 1281 (Fed. Cir. 2011).

Here, plaintiff has not shown that the August 2009 Performance Work Statement introduced "new and material information" to the CSB.  *See Stone*, 179 F.3d at 1376-77.  He has not offered any evidence regarding the outcome of this inquiry or whether Sensei in fact performed any of the listed tasks.  Thus, the Court cannot conclude that a due process violation has occurred.  *See id*.  In this context, harmless error analysis applies.  *See Ward*, 634 F.3d at 1281.  Plaintiff has not shown that the alleged

procedural error likely caused Mr. Bresland to reach a different conclusion than he otherwise would have. *See id.* Finally, plaintiff does not allege that defendant relied on or required additional information in order to reach its termination decision. *See* Docket No. 116 at 20. Rather, it appears that Mr. Bresland relied on the evidence that Mr. Lau provided in support of the Proposal to Remove. *See* Docket No. 108-21 at 1 ("It is my determination that each of the four (4) charges contained in the Proposal to Removal [sic], including each of the specifications supporting those charges, have been proven by a preponderance of the evidence."). Accordingly, the Performance Work Statement does not provide a basis for inferring that defendant's stated reasons for terminating plaintiff's employment are pretextual.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion for Summary Judgment [Docket No. 108] filed by defendant the Chemical Safety and Hazard Investigation Board is GRANTED. Plaintiff's first and second claims for relief are dismissed. It is further

**ORDERED** that Plaintiff's Motion to Strike Material Filed in Support of Defendant's Motion for Summary Judgment [Docket No. 124] filed by plaintiff Francisco Altamirano is DENIED. It is further

**ORDERED** that Plaintiff's Motion to Strike New Arguments Contained in Defendant's Reply in Support of Motion for Summary Judgment; or, in the Alternative, Motion for Leave to File Surreply Brief [Docket No. 126] is DENIED. It is further

**ORDERED** that the Trial Preparation Conference set for Thursday, April 17,

2014 [Docket No. 121] and the three-day jury trial set to begin on Tuesday, May 13,

2014 are VACATED.

DATED April 14, 2014.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge