IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-01728-PAB-MJW

FRANCISCO ALTAMIRANO,

     Plaintiff,

v.

CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD,

     Defendant.

---

## ORDER

---

     This matter is before the Court on Plaintiff's Opening Brief on Third Claim for Relief [Docket No. 75] filed by plaintiff/appellant Francisco Altamirano. This case arises out of Mr. Altamirano's termination from his position as a Chemical Incident Investigator for defendant/appellee the Chemical Safety and Hazard Investigation Board (the "CSB") on the basis that he misused his government travel charge card and government electronic equipment. Mr. Altamirano contends that the decision of the Merit Systems Protection Board upholding his termination lacked a rational basis in law and substantial evidentiary support. The Court's jurisdiction is based on 28 U.S.C. § 1331 and 5 U.S.C. § 7703(b)(2).

## I. BACKGROUND

     Mr. Altamirano began working for the CSB on July 15, 2002. R. at 23. As a Chemical Incident Investigator, Mr. Altamirano was responsible for organizing and conducting onsite investigations of chemical spills and reporting on his factual and

analytical findings.  *Id*. at 188-89.  His work required him to travel all over the country.

*Id*. at 3377.   On July 16, 2002, Mr. Altamirano signed a Government Travel Charge

Card Setup Form for a SmartPay 1 ("SP1") government travel charge card.  *Id*. at 857,

3379.   Above the signature line on the Setup Form, it says "[b]y signing this application,

I acknowledge I have read the Citibank Government Card Services Travel Program

Cardholder Account Agreement and agree to be bound by the terms and conditions as

set forth in the Agreement."  *Id*. at 857.  The Cardholder Account Agreement states: "I

agree to use the Card only for official travel and official travel related expenses away

from my official station/duty station in accordance with my Agency/Organization policy.

I agree not to use the Card for personal, family or household purposes."  *Id*. at 858.

On September 11, 2007, Mr. Altamirano sent an email to another CSB employee

stating that he had completed an ethics training module on the use of his government

charge card.  R. at 87.  Slide number two of the training states: "*ONLY* official

Government expenses incurred as a result of official duty travel may be charged to the

Government travel charge card."  *Id*. at 90 (emphasis in original).  Slide number six lists

the following employee responsibilities: "2.  Use the Travel Card *only* for the purchase

of official travel-related services.  3.  Pay all charges by the statement due date,

regardless of reimbursement by the agency."  *Id*. at 94.

In April 2008, Mr. Altamirano confirmed that he had reviewed a Travel Refresher

Power Point presentation.  R. at 863.  Mr. Altamirano later testified that he did not pay

attention to the slides he reviewed.  *Id*. at 3380.

In December 2008, the SP1 card was replaced by the SmartPay 2 ("SP2") card.

R. at 3380.  On or about December 8, 2008, Mr. Altamirano signed a Statement of

Cardholder Responsibility form for the SP2 card.  *Id*. at 876, 878, 3380.  The statement

provides that the "Government travel charge card can only be used for authorized

official travel expenses such as transportation, lodging, and meals. . . . The card may

not be used for personal expenses at any time.  Misuse of the card is subject to

disciplinary action."  *Id*. at 878.  The face of both the SP1 and SP2 cards carries the

following notice: "For Official Government Travel Only."  R. at 3381.

The CSB's travel charge card program is administered by the Bureau of Public

Debt (the "BPD"), an agency within the United States Treasury Department.  R. at 3381.

Before March 2009, the CSB did not receive any notices from the BPD regarding Mr.

Altamirano's use of his travel charge card.  *Id*.  On March 4, 2009, the BPD sent Anna

Johnson (now Anna Brown), the CSB's Director of Administration, a Citibank Monthly

Delinquency Report indicating that Mr. Altamirano and five other CSB employees were

past due on their SP2 accounts.  *Id*. at 880-81.  On March 9, 2009, the BPD sent Ms.

Brown a Delinquency Report for SP1 cardholders, on which Mr. Altamirano was also

listed as carrying a past due balance.  *Id*. at 889-90.  Ms. Brown and Elizabeth

Robinson, the CSB's Director of Financial Operations, reviewed the Delinquency

Reports and noticed that Mr. Altamirano had made a number of purchases while he

was not traveling for work.  *Id*. at 3382.  The CSB obtained a report from the BPD listing

Mr. Altamirano's government travel charge card transactions since September 2005.

*Id*. at 892.  The report confirmed that Mr. Altamirano had made charges on his

government travel charge card that were not related to his work. *Id*. at 3382.  This

3

information led the CSB to place him on administrative leave on March 19, 2009 so it
could investigate the matter further.  *Id*.

   After further investigation, the CSB determined that, between September 30,
2005 and November 30, 2008, Mr. Altamirano used his SP1 card for 322 transactions
unrelated to government travel, amounting to $22,843.09.  R. at 3380.  Between
December 1, 2008 and March 10, 2009, he used his SP2 card for 27 transactions
unrelated to government travel, for a total of $2,626.04.  *Id*. at 3381.  He did not timely
pay his SP1 card balance for 64 out of 80 billing cycles; he did not timely pay his SP2
card balance for three out of six billing cycles.  *Id*. at 3382.  His total past due balances
accounted for sixty-one percent of all past due balances for CSB employees between
January 2007 and February 2009.  *Id*. at 2395.

   The CSB further found that Mr. Altamirano's accounts were past due fifteen
times between January 2007 and February 2009.  Docket No. 75 at 6.  During the same
period, the CSB found that an employee referred to as Male 6 was past due on his
travel charge card account seven times; an employee referred to as Female 7 was past
due five times; an employee referred to as Female 3 was past due four times; and
employees referred to as Female 6, Male 11, and Female 11 were each past due one
time.  R. at 3397.  The CSB investigated the nature of the charges incurred between
January 1, 2008 and March 13, 2009 by Female 3, Female 6, Female 7, Female 11,
Male 6, and Male 11.  Docket No. 75 at 7; R. at 2361-381.  The CSB found only one
other incident of card misuse–a charge for $3.04 at a Starbucks.  R. at 2383, ¶ 5.

   Two other CSB employees also had issues with past due travel card balances.
On February 27, 2006, the CSB informed Mr. Altamirano's supervisor, Donald

4

Holmstrom, that Mr. Holmstrom's charge card had been placed in pre-suspension status because of an overdue balance.  R. at 2610-11; 3397.  On July 25, 2005, the CSB informed an investigator named Randy McClure that Citibank had closed his account on May 20, 2005 because his card had been suspended twice and his balance was past due once during a twelve-month period.  *Id*. at 3397-98.  On October 14, 2005, the CSB requested that Citibank reopen Mr. McClure's account.  *Id*. at 3398.  Between January 2007 and February 2009, Mr. Holmstrom paid his balance late six times and Mr. McClure paid his balance late five times.  *Id*.  The CSB did not investigate the nature of the charges incurred by Mr. Holmstrom or Mr. McClure.  *Id*. at 2357, ¶¶ 2-3.

None of the other individuals who paid their balances late were removed from employment.  *Id*. at 3398.

During the investigation, Mr. Altamirano told an investigator that a co-worker had told him that he could use the cards for purposes unrelated to travel so long as he paid the balance.  *Id*. at 3388.  The CSB hired a computer forensic company to search Mr. Altamirano's government-issued laptop and email account to verify this statement.  *Id*. The forensics company found eight picture and video files on his laptop containing sexually-oriented materials, in violation of the CSB's policy governing the use of electronic equipment.  *Id*. at 3383-84.  Mr. Altamirano admitted to sending and receiving sexually explicit emails from his government email account between March 16 and March 18, 2009.  *Id*. at 3384.  The search also revealed that Mr. Altamirano had used his government laptop to visit sexually-oriented websites.  *Id*.

On July 29, 2009, the CSB issued a proposal to remove Mr. Altamirano from his position. *Id*. at 3385. The proposal was based on four charges: (1) using his government travel charge card for personal expenses; (2) failing to timely pay his travel card balance; (3) using government equipment to send, solicit, and download sexually explicit materials and communications; and (4) exhibiting a lack of candor during the investigation. *Id*. at 3377, 3385. On November 16, 2009, John Bresland, the Chairperson of the CSB, issued a decision to remove Mr. Altamirano. *Id*. at 3376-77.

Mr. Altamirano appealed the Removal Decision to the Merit Systems Protection Board ("MSPB" or the "Board"). *Id*. at 3387. An Administrative Law Judge ("ALJ") held a hearing on April 14 and 15, 2010. R. at 3376. The ALJ affirmed the CSB's decision. R. at 3376-3403. Mr. Altamirano appealed the ALJ's decision to the full Board, which affirmed the ALJ. *Id*. at 3501-506. The Board found that the ALJ properly weighed the applicable factors and that Mr. Altamirano's "mere disagreement with the administrative judge's findings is insufficient to disturb the initial decision." *Id*. at 3502.

On July 1, 2011, Mr. Altamirano filed a complaint in this Court. Docket Nos. 1 and 2. His complaint included a claim for employment discrimination pursuant to Title VII of the Civil Rights Act of 1964; the Court granted defendant summary judgment on this claim. Docket No. 147. The complaint also requests review of the MSPB's decision under 5 U.S.C. § 7703, on the grounds that the "penalty of removal was too harsh" and that the ALJ failed to "properly consider all the applicable mitigating factors as required by law and regulation." Docket No. 2 at 4, ¶¶ 22-24. The CSB opposes plaintiff's request for reversal of the MSPB's decision. Docket No. 91.

## II.  STANDARD OF REVIEW

A federal employee "adversely affected or aggrieved by a final order or decision" of the MSPB and alleging employment discrimination may seek judicial review of the MSPB's decision in federal district court.  5 U.S.C. § 7703(a)(1); *Kloeckner v. Solis*, 133 S. Ct. 596, 604 (2012).  In such "mixed" cases, claims not related to discrimination are reviewed under the standard set forth in 5 U.S.C. § 7703(c):

> the court shall review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be–
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) obtained without procedures required by law, rule, or regulation having been followed; or
>
> (3) unsupported by substantial evidence[.]

Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

Under this standard, the "MSPB's decision needs only to have a rational basis in law." *Williams v. Rice*, 983 F.2d 177, 180 (10th Cir. 1933) (internal citation omitted). The Court is not permitted to "substitute its judgment for that of the MSPB," *id.*, "reweigh the evidence," or "reevaluate the ALJ's credibility determination." *Thunderbird Propellers, Inc. v. F.A.A.*, 191 F.3d 1290, 1297 (10th Cir. 1999).  The Court will "affirm a decision of the MSPB sustaining the termination of a federal employee if the 'decision complies with the applicable statute and regulations and [if] it has a rational basis supported by substantial evidence from the record taken as a whole." *Jones v. Sec'y,*

*Dept. of Army*, 912 F. Supp. 1397, 1413 (D. Kan. 1995) (quoting *Martin v. Fed. Aviation Admin.*, 795 F. 2d 995, 997 (Fed. Cir. 1986)).

## III.  ANALYSIS

### A.  Zero-Tolerance Policy

Mr. Altamirano argues that the ALJ and the MSPB "erred in deferring to the CSB's penalty determination and in not making an independent determination of the appropriate penalty in this case."  Docket No. 75 at 13.

Mr. Bresland testified at the April 2010 hearing before the ALJ that "we make it a practice in the Chemical Safety Board to have a very low tolerance for any abuses of the travel regulations or the use of the government credit card."  R. at 2955.  Mr. Altamirano's counsel subsequently asked:

Q.  Would you have characterized that as close to a zero tolerance?

A.  Yes.

Q.  And would it be accurate to say that the Agency has a zero tolerance for misuse of the travel charge card?

A.  I would say it's close to a zero tolerance.  It would depend, that there may be some circumstances where someone made a mistake.

Q.  Would you say that the Agency has a zero tolerance for failure to pay balances on a travel charge card in a timely manner?

A.  From time to time, that has come up as an issue, so I wouldn't say we have a zero tolerance for it.  There are some times where it is an issue and we find out about it and we follow up and we talk to the people involved. . . .

Q.   With respect to the kind of behavior that Mr. Altamirano had, it's your testimony that the Agency has zero tolerance for that kind of behavior in terms of the kinds of charges he was making on his travel charge card?

A.  Certainly, the fact that he made 300 or more charges of a personal nature

to the government credit card, amounting to a significant amount of money, $25,000, plus significant numbers of withdrawals from ATMs which, according to the Emails that we saw, that the amount–in some cases the amounts being withdrawn from the APM–ATM was being used to deal with other credit issues that he had, we don't have a tolerance for that sort of behavior.

Q.  And with respect to the issue of we've been calling misuse of government equipment, am I also correct in understanding the Agency has a zero tolerance for that kind of behavior?

A.  The issue of dialing pornographic material and sending inappropriate Emails to females outside of the Agency, we would not–we would have a zero tolerance for that.

R. at 3017-19.  In reviewing the ALJ's decision, the MSPB stated:

Furthermore, we do not agree with the appellant's assertion that the agency applied a zero tolerance policy to [Mr. Altamirano].  The record reflects that the deciding official considered all of the relevant *Douglas* factors in his decision to effect the appellant's removal.  There is no evidence that the agency had a zero tolerance policy or applied it to the appellant.  The deciding official's testimony regarding the agency's low tolerance for the appellant's misconduct does not persuade us of the existence or application of a zero tolerance policy; rather, it is clear that the deciding official considered the severity and frequency of the appellant's misconduct to determine the appropriate penalty.

R. at 3502-03 (citations omitted).

"When an agency imposes removal under a zero tolerance policy without giving bona fide consideration to the appropriate *Douglas* factors, its penalty determination is not entitled to deference."  *Cunningham v. U.S. Postal Service*, 112 M.S.P.R. 457, 459 (MSPB 2009).

Mr. Altamirano relies exclusively on Mr. Bresland's testimony in arguing that the CSB dismissed him pursuant to a "zero tolerance" policy and thus that its decision did not merit deference.  Docket No. 75 at 12-13.  Mr. Altamirano does not offer any evidence that the decision was made pursuant to a written or otherwise official agency

policy as discussed in the relevant case law.  *See Cunningham*, 112 M.S.P.R. at 460 ("the administrative judge found that the deciding official imposed the penalty of removal because he believed that the agency's zero tolerance policy requires removal for a sustained charge of violence in workplace"); *Wiley v. U.S. Postal Service*, 102 M.S.P.R. 535, 540 (MSPB 2006) ("Here, the agency chose to charge the appellant with improper conduct for violating a provision of its zero tolerance policy.  That provision prohibits any 'actual, implied or veiled threat, made seriously or in jest.'") (citation omitted); *Omites v. U.S. Postal Service*, 87 M.S.P.R. 223, 228 (MSPB 2000) ("The policy, in essence, states that any violence, threats, harassment, intimidation or bullying will not be tolerated, and that management will take appropriate action when violations of the policy are reported.").

The Court finds that Mr. Bresland's testimony indicates only that the CSB considered Mr. Altamirano's conduct to be serious.  Mr. Bresland's testimony does not reflect a blanket determination that misuse of a charge card is grounds for removal regardless of the circumstances of a given case.  He noted that the CSB would consider "circumstances where someone made a mistake" in evaluating the misuse of a travel charge card.  R. at 3017.  Mr. Bresland's testimony contains a detailed consideration of the specific nature of Mr. Altamirano's misconduct, including the number of inappropriate charges, the cash value of the inappropriate charges, and the fact that Mr. Altamirano misused his government charge card in order to manage unrelated credit problems.  *Id*. at 3019.  Likewise, Mr. Bresland specified that the CSB has no tolerance for "sending inappropriate Emails to females outside of the Agency." *Id*.  Taken as a whole, this testimony indicates that the removal decision was based on

10

the unique circumstances of Mr. Altamirano's conduct and not on the application of an

unyielding policy.  Furthermore, the Removal Decision contains a nine and a half page

discussion of the relevant factors the CSB considered, belying Mr. Altamirano's

contention that the CSB's decision was mechanistic or cursory.  *See* R. at 25-34.

Accordingly, the Court finds that the MSPB did not err in deferring to the CSB's

decision.

### B.  *Douglas* Factors

Mr. Altamirano contends that the "MSPB's decision did not have a rational basis

in the law" and "did not have a rational basis supported by substantial evidence from

the record taken as a whole" because the ALJ failed to properly consider the factors set

forth in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 331-32 (MSPB 1981),[1] in

---

[1]Those factors are:

"(1)  The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2)  the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

(3)  the employee's past disciplinary record;

(4)  the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5)  the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6)  consistency of the penalty with those imposed upon other employees for the same or similar offenses;

11

determining that the CSB's penalty was not excessive.  Docket No. 75 at 14.

When taking adverse action against an employee, an employing agency like the CSB must establish that three criteria are satisfied: (1) a preponderance of the evidence indicates that the charged conduct occurred; (2) there is a nexus between the charged conduct and the efficiency of the service; and (3) the penalty imposed was reasonable in light of the relevant *Douglas* factors.  *Malloy v. U.S. Postal Service*, 578 F.3d 1351, 1356 (Fed. Cir. 2009).

The MSPB "determines *de novo* the underlying facts of the case such as whether the employee engaged in the alleged misconduct and whether the agency exceeded its authority in determining that the employee's misconduct would adversely affect the efficiency of service," but the "determination of an appropriate penalty is a matter committed primarily to the sound discretion of the employing agency" and is not subject to de novo review.  *Norris v. S.E.C.*, 675 F.3d 1349, 1355 (Fed. Cir. 2012) (citation omitted).  Rather, the MSPB reviews penalty determinations "deferentially, to

---

(7)  consistency of the penalty with any applicable agency table of penalties;

(8)  the notoriety of the offense or its impact upon the reputation of the agency;

(9)  the clarity with which the employee was on notice of any rules that where violated in committing the offense, or had been warned about the conduct in question;

(10)  potential for the employee's rehabilitation;

(11)  mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

(12)  the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others."  *Douglas*, 5 M.S.P.B. at 305-06.

assess whether the employer agency 'did conscientiously consider the relevant factors and did strike a responsible balance within tolerable limits of reasonableness.'" *Fogg v. Ashcroft*, 254 F.3d 103, 112 (D.D.C. 2001) (citing *Douglas*, 5 M.S.P.B. at 332-33). The MSPB "cannot disturb the penalty chosen by the agency unless it is so 'outrageously disproportionate' to the charged offense in light of all relevant factors as to constitute an abuse of discretion." *Bryant v. Nat'l Science Foundation*, 105 F.3d 1414, 1416 (Fed. Cir. 1997) (citation omitted).

Moreover, *Douglas* does not "demand a ritualistic formality," but rather requires the MSPB to consider only those factors that it deems relevant to the case at issue. *Nagel v. Dep't of Health & Human Servs.*, 707 F.2d 1384, 1386-87 (Fed. Cir. 1983); *see also Kumferman v. Dep't of Navy*, 785 F.2d 286, 291 (Fed. Cir. 1986) ("It is not reversible error if the Board fails expressly to discuss all of the Douglas factors. The Board need only determine that the agency considered the factors significant to the particular case.") (citation omitted). However, "failure to consider a significant mitigating circumstance constitutes an abuse of discretion." *VanFossen v. Dep't of Housing & Urban Development*, 748 F.2d 1579, 1581 (Fed. Cir. 1984).

When an agency does not prove all its charges, the MSPB "may not independently determine a reasonable penalty," but may "mitigate [the penalty down] to the maximum reasonable penalty" or "impose the same penalty imposed by the agency based on a justification of that penalty as the maximum reasonable penalty after balancing the mitigating factors." *Gray v. Government Printing Office*, 111 M.S.P.R. 184, 190-91 (MSPB 2009).

"[M]ost courts have applied [§ 7703's] standard of review to the decision of the MSPB . . . rather than to the original agency action."  *Nat'l Treasury Employees Union v. U.S. Merit Systems Protection Bd.*, 743 F.2d 895, 913 n.22 (D.C. Cir. 1984) (citation omitted); *see also Norris v. S.E.C.*, 675 F.3d 1349, 1355 (Fed. Cir. 2012) ("we 'must review the agency action based on the record made to the [Board] and the [Board] findings, rather than review the agency action solely on the basis of the agency's record") (citation omitted).

### 1. *First* Douglas *Factor*

With respect to the first *Douglas* factor, the nature and seriousness of the offense, Mr. Altamirano argues that the ALJ failed to consider the following evidence: (1) the "CSB did not remove a similarly situated employee whose GTCC was suspended while he continued to work for [the CSB] in the same job classification as the one that Mr. Altamirano held"; (2) the CSB did not monitor Mr. Altamirano's use of his GTCC or provide formal training on how to use the card for his first five years of employment; (3) Mr. Altamirano did not intentionally misuse his card; (4) Mr. Altamirano testified that "several Citibank representatives told him that he had 37 days to pay the balance due on his card"; (5) "no one told Mr. Altamirano that there was any problem with the timeliness of his payments before March 2009"; (6) there was no nexus between Mr. Altamirano's ability to do his job and two of the three charged offenses (making late payments and misusing government equipment); and (7) the CSB did not investigate the equipment of other employees who made late payments or terminate an employee whose travel card was suspended for five months.  Docket No. 75 at 15-17.

14

The ALJ's decision indicates that the ALJ gave proper consideration to this evidence.  The ALJ found the contention that Mr. Altamirano did not intentionally misuse his card irrelevant because "intent is not an element of the charge of misuse of a government-provided credit card."  R. at 3389.  The ALJ also found that the CSB was not obligated to warn Mr. Altamirano that he was misusing his card in order to put him on notice of the problem.  *See id*. ("The fact that agency management did not also verbally advise the appellant of the proper use of the government travel card in no way excuses the appellant's admitted misconduct."); *see also id*. at 3390 ("an agency warning to remind him to timely pay his GTCC balances is unnecessary and any failure in that regard in no way ameliorates the appellant's responsibility to have paid his GTCC balances immediately upon receipt of billing statements.").  The ALJ rejected Mr. Altamirano's "excuses with regard to his failure to timely pay GTCC balances" on the basis that Mr. Altamirano "1) proffered no evidence, other than bare assertions, that there is a 37-day grace period; [and] 2) the GTCC agreement clearly and unambiguously states that payment is due 'no later than 25 calendar days from the closing date on the statement in which the charge appeared.'"  *Id*. at 3390.  Finally, the ALJ considered the evidence that the CSB treated other similarly situated employees differently and concluded that,

> [w]hile it is clear there were other employees that had issues timely paying their GTCC balances, the appellant proffered no evidence to show that any of the comparators were delinquent in their payments as many times as was the appellant.  More importantly however, no evidence was proffered to show that management officials were aware that any of the comparators misused their GTCC or misused government equipment.  In that regard, the cited comparators are in no way similarly situated to the appellant.

*Id*. at 3398; *see also* R. at 3401 ("no evidence has been proffered that any employee

engaged in all three of the sustained charges . . . to the extent and degree as did the appellant and yet were not removed").

Although the ALJ did not directly address Mr. Altamirano's argument that the CSB did not search anyone else's government equipment for inappropriate material, this contention does not render the ALJ's conclusion an abuse of discretion.  The ALJ's finding that no other employees were similarly situated to Mr. Altamirano with respect to their misuse and late payment of their travel charge card was supported by substantial evidence, namely, Mr. Altamirano's admissions and the results of the CSB's investigations of other cardholders.  Mr. Altamirano suggests that the CSB should have conducted further investigations, *see* Docket No. 75 at 19, but this suggestion is based on speculation–there is no evidence that any other employees misused their travel cards in any significant way, let alone to the extent that Mr. Altamirano did.  Given that no other employees similarly misused their travel charge cards, there was no disparity in the CSB's decision to search only Mr. Altamirano's electronic equipment.

In sum, the ALJ properly concluded that the CSB gave sufficient consideration to the first *Douglas* factor.  Mr. Altamirano's disagreement with the ALJ's weighing of the relevant evidence is not a proper basis for review.  *See Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983) ("the standard of review does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence") (emphasis in original).

### 2.  *Second* Douglas *Factor*

With respect to the second factor, the employee's job level and type of

employment, Mr. Altamirano argues that the ALJ should have considered the fact that he was not in a fiduciary role to be a mitigating factor.  Docket No. 75 at 18. Specifically, Mr. Altamirano argues that he was not appointed to the position of Contracting Officer's Technical Representative ("COTR") until March 12, 2009, one week before being placed on leave.  *Id*.  Mr. Altamirano also asserts that, "[i]n reality, [he] functioned as a team player with very limited contact with the public."  *Id*. at 17.

> The Removal Decision states:
>
> You are a GS-14 Chemical Incident Investigator in Denver, Colorado. Although you are not a supervisor, your position requires extensive contact with other federal agencies, local police and fire departments, management and hourly employees and members of the public through the CSB's investigations and public meetings.  You are the most senior investigator on staff (based on length of CSB service for our non-supervisory investigation employees).  In addition, you serve as a Contracting Officer's Technical Representative ("COTR") which requires you to oversee important contract work involving the expenditure of significant amounts of CSB funds.  You also had responsibility for a government purchase card.

R. at 27-28.  The ALJ did not discuss whether Mr. Altamirano served in a fiduciary role.

As the language of the Removal Decision indicates, Mr. Altamirano's recent promotion to the role of COTR and his contact with the public were only part of Mr. Bresland's determination that Mr. Altamirano served in a fiduciary role.  *See* R. at 27-28.  Mr. Bresland also considered Mr. Altamirano's interaction with other government agencies, his seniority, and his access to a travel charge card, factors that Mr. Altamirano does not dispute.  *See id.*  These factors are sufficient on their own to support Mr. Bresland's conclusion that Mr. Altamirano served in a fiduciary role.

Thus, the Court finds that Mr. Altamirano's job level was not a significant mitigating circumstance and that the ALJ's decision not to discuss this factor was not an

abuse of discretion.  *See Nagel v. Dep't of Health & Human Servs.*, 707 F.2d 1384, 1386 (Fed. Cir. 1983) ("The [MSPB] never intended that each [*Douglas*] factor be applied mechanically, nor did it intend mandatory consideration of irrelevant factors in a particular case, or that it should be reversible error not to state expressly that a factor was considered and found irrelevant.").

### 3.  *Fifth* Douglas *Factor*

With respect to the fifth factor, the effect of the offense upon the employee's ability to perform his job satisfactorily, Mr. Altamirano argues that the ALJ should have discussed evidence that (1) Mr. Altamirano had not been previously disciplined; (2) Mr. Altamirano had been rated as "fully successful" in his most recent performance evaluation; and (3) Mr. Altamirano's immediate supervisor, Donald Holmstrom, did not believe that his performance would be impacted by the alleged misconduct so long as Mr. Altamirano was still able to travel.  Docket No. 75 at 18.

At the April 15, 2010 hearing before the ALJ, Mr. Altamirano's attorney asked Mr. Holmstrom whether Mr. Altamirano's alleged misconduct would impact Mr. Holmstrom's confidence in Mr. Altamirano's ability to do his job.  R. at 3297.  Mr. Holmstrom testified as follows:

> [E]xcept for the caveats I've already given, no.  And that would be along the lines of is somebody–number one, is somebody, you know, going to prohibited websites during work times or the other one is if somebody's card has been revoked, that would be difficult for–difficulties for them to deploy because they need to use the travel card for things like, you know, airplane flights and that sort of thing.  And so that would present some difficulties, but assuming that those issues aren't present, then the conduct is the conduct and the performance is the performance, and I don't see the conduct necessarily impacting the performance.

R. at 3298.

The ALJ found that there is a well established nexus between misusing a government-issued credit card or misusing government equipment and the efficiency of the government service.  R. at 3399 (citing, *inter alia*, *Quarters v. Dep't of Veterans Affairs*, 97 M.S.P.R. 511, 513 (M.S.P.B. 2004) (finding that 30-day suspension for misuse of government credit card would "promote the efficiency of the service"); *Casteel v. Dep't of Treasury*, 97 M.S.P.R. 521, 525 (M.S.P.B. 2004) (upholding dismissal for misuse of government credit card where removing official testified to "loss of trust and confidence in the appellant as a result of her misconduct"); *Quillen v. Dep't of the Treasury*, 96 M.S.P.R. 154, 159 (2004) (holding that misuse of government equipment, including use of government computer for the purpose of viewing pornography on government time, was directly related to employee's "duties, position, and responsibilities as a Computer Specialist")); *see also Zernechel v. U.S. Postal Service*, 1990 WL 200232, at *1 (Fed. Cir. Dec. 13, 1990) ("since the position required frequent travel, Zernechel's misuse of his credit card and travel funds directly affected the Postal Service's confidence and trust in permitting him to engage in travel").

The ALJ discussed the fact that Mr. Bresland

> considered that failure to timely pay the travel card balances impacted [Mr. Altamirano's] Chemical Incident Investigator position because in order to fulfill the duties of the position which required extensive travel he must maintain the ability to use the GTCC.  This was further complicated by [Mr. Altamirano's] issuance of two insufficient funds checks which resulted in Citibank notifying the agency that the appellant's SP2 GTCC account was ineligible for reinstatement.  Accordingly, Bresland concluded he had lost confidence in the appellant's ability to perform any aspect of his job which required him to handle a credit card or otherwise use government funds.

R. at 3400.  In addition, the ALJ "fully recogniz[ed] the mitigating factors considered by

deciding official Bresland," R. at 3402, including "appellant's seven years of Federal service, his 2007 and 2008 fully satisfactory performance ratings, his teamwork and interpersonal skills, [] dependability in deploying on short notice to numerous incidents, [and] his discipline-free work record." *Id*. at 3401.

Contrary to Mr. Altamirano's contention, the ALJ did consider all but one of the points that Mr. Altamirano raises. *See* R. at 3401. The only point that the ALJ did not explicitly discuss was Mr. Holmstrom's testimony regarding his opinion of the hypothetical impact that the charged conduct would have had on an employee's job performance. The fact that the ALJ did not discuss this testimony does not render the decision arbitrary or capricious. Although Mr. Holmstrom's testimony provides some support for Mr. Altamirano's argument, it does not alter the fact that substantial evidence supports the ALJ's determination, namely, Mr. Bresland's finding that Mr. Altamirano's failure to timely pay his balances impacted his job performance, the importance of the travel card to plaintiff's job responsibilities, and the cited case law on misusing government resources. *See Brison v. Dep't of Veterans Affairs*, 549 F. App'x 976, 978 (Fed. Cir. 2013) ("While Ms. Brison highlights some evidence that supports her arguments, substantial evidence still supports the Board's findings and conclusions.").

Furthermore, absent evidence to the contrary, the Court presumes that the ALJ reviewed all relevant evidence. *See Vick v. Dep't of Transportation*, 545 F. App'x 986, 991 (Fed. Cir. 2013) ("this court presumes–absent specific evidence to the contrary–that the fact finder reviews all evidence presented") (citing *Gonzales v. West*, 218 F.3d 1378, 1381 (Fed. Cir. 2000)). There is no evidence that the ALJ did not

consider Mr. Holmstrom's testimony.  Moreover, the Court cannot reweigh the evidence by, for example, concluding that Mr. Holmstrom's testimony outweighs that of Mr. Bresland.  *See Bonet v. U.S. Postal Service*, 712 F.2d 213, 216 (5th Cir. 1983) ("This Court may not reweigh the evidence or substitute its own judgment for that of the Board even if this Court finds that the evidence preponderates against the Board's decision.").

In sum, the Court finds that the ALJ did not abuse his discretion in considering the fifth *Douglas* factor.

### 4.  Sixth Douglas *Factor*

With respect to the sixth factor, consistency of the penalty with those imposed on other employees for similar offenses, Mr. Altamirano argues that the ALJ erred in concluding that no other CSB employee engaged in conduct similar to that of Mr. Altamirano because (1) Male 1's travel card was canceled for at least five months; (2) Male 3's travel card was placed in pre-suspension status for failing to timely pay the balances; (3) the CSB did not conduct forensic searches of any other employees' computers; and (4) the CSB did not review the travel records of all twenty-two employees and did not review any records for the period of time before January 1, 2008.  Docket No. 75 at 19-20.

The ALJ found that

> no evidence has been proffered that any employee engaged in all three of the sustained charges (misuse of the GTCC, failure to timely pay GTCC balances and misuse of government equipment) to the extent and degree as did the appellant and yet were not removed.  The appellant's only remotely close comparator is co-worker Randy McClure, whose GTCC was suspended for a period of time due to untimely payment of balances and who, according to the appellant's testimony, showed him pictures of nude or semi-nude women stored on his government computer.  The appellant proffered no evidence that any management official was aware or had been

21

notified that McClure had inappropriate photos stored on his government computer, yet failed to take any action to impose discipline.  Furthermore, unlike the appellant, no evidence was proffered to show that McClure had misused his GTCC.

R. at 3401.

Mr. Altamirano argues that he was similarly situated to Male 1 and Male 3 because Male 1's card was canceled for at least five months and Male 3's card was placed in pre-suspension status.  Docket No. 75 at 19.  However, these events occurred in 2005 and 2006, three years before the CSB discovered Mr. Altamirano's misconduct.  R. at 3397-398.  A "significant amount of time between" an appellant's removal and the conduct of a comparator employee "undermines any disparate penalty showing the appellant could otherwise make."  *Chavez v. Small Bus. Admin.*, 121 MSPR 168, 182 (M.S.P.B. 2014).  Although Male 1 paid his balance late six times between January 2007 and February 2009 and Male 3 paid his balance late five times during the same period, the ALJ did not abuse his discretion in finding that this conduct was not comparable to that of plaintiff, who paid his balance late fifteen times during that time period.  *See* R. at 3397-398.  *See Jones v. E.P.A.*, 524 F. App'x 598, 604 (Fed. Cir. 2013) (factfinder acted within his discretion in finding that "participating in the annual office basketball pool was not similar to engaging in outside business during work hours or sending inappropriate emails").

### 5.  *Ninth* Douglas *Factor*

With respect to the ninth factor, the clarity of the employee's notice regarding the rule he violated, Mr. Altamirano argues that the ALJ did not consider that (1) the information in the original GTCC set-up form was "buried in fine print"; (2) the next time

Mr. Altamirano received information about the card was more than five years after he began working at the CSB; and (3) the CSB did not say anything to Mr. Altamirano about the usage of his card during that five-year period.  Docket No. 75 at 20-21 ("Mr. Altamirano was lulled into a false sense of security by the CSB's failure to tell him, during the nearly eight years that he worked for it prior to March 2009, that he was misusing his GTCC or that he was not paying the balances on that card in a timely manner.").

As discussed above in relation to the first *Douglas* factor, the ALJ made extensive findings regarding Mr. Altamirano's notice of the applicable rules, as well as Mr. Altamirano's credibility in stating that he was not aware that his use of the card was inappropriate:

> The cardholder agreements the appellant signed make it clear that the government travel card is for government travel-related expenses only.  The training the appellant received clearly and unambiguously communicated that the GTCC is for government travel-related expenses only.  Language printed on the face of the SP1 and SP2 travel cards explicitly states, "FOR OFFICIAL GOVERNMENT TRAVEL ONLY."  Had he simply paid attention to what he was signing and the training provided by the agency, he would have realized he could not use the GTCC in the same fashion he had previously used his corporate card with his former employer. . . . It is implausible and inherently improbable that the appellant should not have been aware that his personal use of the GTCC was improper. . . . The fact that agency management did not also verbally advise the appellant of the proper use of the government travel card in no way excuses the appellant's admitted misconduct.  *See Tom v. Dep't of the Interior*, 97 M.S.P.R. 395, ¶ 28 (2004) ("It should be obvious to any casual Government traveler . . . that one cannot use the card to pay for hotels while on personal travel").

R. at 3388-89.

The ALJ's decision indicates that the ALJ did consider the evidence Mr. Altamirano cites and that the ALJ rejected it, finding that the cardholder agreements

"make it clear" that the travel charge card was to be used solely for work-related expenses and that the agency was not required to warn or remind Mr. Altamirano of these obligations.  *See id*.  Thus, Mr. Altamirano is incorrect insofar as he argues that the ALJ did not consider this information.  Furthermore, the ALJ's decision was based on an assessment of Mr. Altamirano's credibility, which was neither "inherently unreasonable" nor "self-contradictory" and which is thus entitled to deference on appeal.  *See N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998).

### *6.  Tenth* Douglas *Factor*

Mr. Altamirano argues that the ALJ should have considered the CSB's failure to prove its lack of candor charge as relevant to the tenth *Douglas* factor, the potential for rehabilitation.  Docket No. 75 at 21-22.  Mr. Altamirano further argues that the ALJ should not have deferred to the CSB's penalty determination because Mr. Bresland misjudged Mr. Altamirano's rehabilitative potential.  *Id*. at 21.  Finally, Mr. Altamirano argues that he took responsibility for his actions in this instance and that he has demonstrated his potential for rehabilitation by improving his performance on past occasions.  *Id*. at 22-23.

In the Removal Decision, Mr. Bresland carefully considered Mr. Altamirano's potential for rehabilitation, which the Court will quote at length:

> I have carefully and seriously considered whether you demonstrate potential for rehabilitation.  In doing so, I did note that you have no prior discipline and that your performance for the past 2 rating periods has been "Fully Successful."  You also have been willing to deploy frequently and on short notice.  Thus, I recognize that you have been of value to the CSB during your years of service and that the possibility of your rehabilitation potential needs

to be carefully considered in proposing a penalty.

Unfortunately, your pattern of financial misconduct, inability to abide by clear rules, and your response to the inquiry undermine my view of your potential for rehabilitation.   You systematically and persistently misused your government travel charge card on 349 separate occasions during 2005-2009 for a total of over $25,000 in improper charges.  You have been delinquent in paying balances due on your SP1 and SP2 accounts at least 75% of the time.    These are not the occasional missteps of an employee with rehabilitative potential.

A potential for rehabilitation can be demonstrated by providing candid responses to questions about misconduct and accepting responsibility for misconduct.   You have neither been candid nor have you truly accepted responsibility.  For example, although you stated in your affidavit that you are "terribly sorry", you lacked candor in your statements to the investigator.  You presented excuses but took no responsibility for your conduct.   In fact, instead of accepting the blame yourself for misusing your government travel charge card, you claim–with no credibility–that other unnamed CSB investigators gave you the impression that you could misuse your government travel charge card.   Your statement to the investigator contradicts itself.  There was no clear, candid explanation of your misuse of the travel charge card that you have offered to date.  I do note that in your September 4th written reply to the Proposed Removal you stated that Mr. John Murphy (retired CSB employee) had informed you that "it was OK to use the CSB travel charge card for non-travel related expenses, as long as [you] paid for those expenses personally."  However, I do not consider this claim credible.

You have demonstrated a lack of potential for rehabilitation.  After it was plain that there was serious concern about the use of your credit card, you failed to demonstrate behavior which indicated a commitment to addressing your conduct.   Specifically, you were instructed by Ms. Johnson in a memorandum on March 19, 2009, to immediately payoff your SP2 balance. On that same date, you advised Ms. Johnson that "all charges classified as delinquent on [your] travel card were paid in full on 3-18-09."  However, even after this explicit instruction from Ms. Johnson and your assertion that the matter had been resolved, you did not resolve it promptly as instructed. Instead, you issued two checks with insufficient funds to Citibank.  As a result, Citibank cancelled your travel card per the Cardholder Agreement, and Citibank has advised CSB that your SP2 account is "now ineligible for reinstatement" as a result of your issuance of these two bad checks.  You were also well aware of the limits on the use of government office equipment, but you ignored these basic rules.

> A hallmark of someone with rehabilitation potential is an ability to learn and demonstrate improved behavior.  You have not demonstrated that ability.  Instead, you ignored clear notice of what constitutes impermissible conduct (including a plain notice on the front of your card), ethics rules, CSB orders, and specific warnings about improper conduct.  Instead, you make excuses like "computer based training is not as effective as it should be."  You also admit that "attempts to help me understand the rules [about credit card use] just did not resonate."
>
> Based on your persistent pattern of misconduct, your poor response to resolving a major problem related to this misconduct, and your poor ability to learn and address your misconduct, I do not believe that you are a candidate for rehabilitation.

R. at 32-33 (internal citations omitted).

The ALJ found that the CSB did not prove the charge of lack of candor because Mr. Altamirano did not try to "conceal the fact that he misused the [travel charge card], failed to pay his [] balances in a timely fashion or misused government equipment.  What he has attempted to do is explain the reasons why" he engaged in the charged conduct.  R. at 3392.  The ALJ found that these explanations, "although greatly misguided given the evidence that [Mr. Altamirano] clearly should have known better, do not amount to a lack of candor but rather go to the appellant's credibility."  *Id*. at 3393.  The ALJ further found that the "evidence shows [Mr. Altamirano] made reasonable efforts to pay the delinquencies immediately as ordered and but for the issues regarding insufficient funds due to a mix up with the accounts, he would have done so."  *Id*. at 3395.  In evaluating the CSB's assessment of Mr. Altamirano's potential for rehabilitation, the ALJ stated:

> Bresland considered the appellant's misconduct to be very serious and intentional.  He considered the frequency of the misconduct as an aggravating factor.  He found that the appellant had been provided notice and training with regard to the proper use of the GTCC and government equipment and that these were serious aggravating factors.  He also stated

he would have made the same decision to remove the appellant even if he did not sustain all of the specifications for each charge and even if he did not sustain all of the charges.  He specifically felt the appellant was not a good candidate for rehabilitation because of his pattern of financial misconduct, inability to abide by clear rules and the "excuses" he tried to make for his misconduct.  He considered as mitigating factors the appellant's seven years of Federal service, his 2007 and 2008 fully satisfactory performance ratings, his teamwork and interpersonal skills, and dependability in deploying on short notice to numerous incidents, his discipline-free work record, the lack of public notoriety regarding the events in question and minimal impact on the reputation of the agency.

R. at 3400-01.  The ALJ concluded that, "fully recognizing the mitigating factors considered by deciding official Bresland and the fact that the agency has failed to prove the lack of candor charge, I find the seriousness and frequency of the appellant's misconduct justifies the removal penalty imposed by the agency."  *Id*. at 3402.

The MSPB "need not defer to the agency's penalty determination" if it finds that the "deciding official failed to appropriately consider the relevant factors," *Wentz v. U.S. Postal Service*, 91 M.S.P.R. 176, 183 (MSPB 2002), such as the "appellant's rehabilitative potential."  *Von Muller v. Dep't of Energy*, 101 M.S.P.R. 91, 101 (MSPB 2006).  However, even where deference is not afforded the agency's determination, the MSPB may conclude that the "removal penalty lies within the bounds of reasonableness."  *Id*. at 102.

In *Von Muller*, the MSPB did not defer to the Department of Energy's removal decision because, while the "appellant's responses to the proposed removal [were] at times defensive, they also include acknowledgments of wrongdoing, expressions of remorse, and assurances that the misconduct will not be repeated," leading the MSPB to conclude that the "appellant's potential for rehabilitation was at worst neutral, and

should not have been considered as an aggravating factor."  101 M.S.P.R. at 101.  The MSPB nonetheless found that the removal penalty was reasonable given the seriousness of the appellant's sustained misconduct.  *Id*. at 102.

Mr. Altamirano argues that the ALJ should not have deferred to the CSB's penalty determination because the Removal Decision relies in part on the lack of candor charge that the ALJ did not sustain.  Docket No. 75 at 21-22.

First, the ALJ's decision indicates that he did consider his rejection of the lack of candor charge in assessing the reasonableness of the removal penalty.  *See* R. at 3402.  Second, Mr. Bresland's determination that Mr. Altamirano lacks rehabilitative potential was based on a number of other factors, in particular Mr. Altamirano's ongoing financial misconduct, his admitted inability to assimilate information in training materials, and his lack of credibility in accounting for his behavior.  *See id*. at 32-33.  The ALJ's decision shows that he found these factors, none of which Mr. Altamirano disputes, central to Mr. Bresland's determination.  *Id*. at 3401.  Furthermore, although the ALJ did not find that Mr. Altamirano demonstrated an actionable lack of candor, he did find that Mr. Altamirano's implausible explanations for his conduct undermined his credibility and thus there is no basis for finding that Mr. Bresland improperly considered the significance of these explanations.  *See id*. at 3393-394 ("said admission may go to appellant's credibility regarding whether it is believable to conclude he had no knowledge or understanding that he was prohibited from using the SP1 for anything other than official government travel expense").

In addition, as noted by the ALJ, Mr. Bresland considered the mitigating factor of

Mr. Altamirano's long record of valuable service to the CSB.  *See* R. at 32.  Mr. Altamirano offers additional evidence of his rehabilitative potential, such as his "ability to accept constructive criticism and improve his work performance," Docket No. 75 at 22-23, but the Court cannot find that this evidence outweighs the factors relied upon by Mr. Bresland.

In sum, "based on the seriousness of the sustained misconduct, [the Court] cannot say that the penalty of removal lies outside the bounds of reasonableness" and therefore finds that the ALJ did not abuse his discretion in deciding to sustain it.  *See Von Muller*, 101 M.S.P.R. at 102.

### 7.  *Twelfth* Douglas *Factor*

With respect to the twelfth factor, the adequacy of alternative sanctions, Mr. Altamirano argues that the "CSB could have suspended him without pay for a period of time" and that the "availability of those alternative sanctions should be considered a mitigating, not an aggravating, factor."  Docket No. 75 at 23.

In the Removal Decision, the CSB considered whether alternative sanctions were available and found that none would "adequately and effectively deter" further misconduct.  R. at 33.  This determination was based on the finding that Mr. Altamirano engaged in the charged misconduct for a number of years, despite knowing that he was behaving improperly.  *Id*.  The ALJ found that the CSB properly considered this factor. *Id*. at 3400-401.

Mr. Altamirano asserts that suspending him without pay "would have sent a clear message to other employees and to him that it considers his conduct violations to be

serious and that they are not to be repeated." Docket No. 75 at 23.

As the CSB points out, Docket No. 91 at 29, Mr. Altamirano does not contend

that the CSB failed to consider the availability of alternative sanctions, but instead

disagrees with the CSB's conclusion that there were no appropriate alternatives

available. His disagreement does not alter the fact that, as the ALJ found, *see* R. at

3400-401, the CSB explicitly considered this factor in its Removal Decision. *See id*. at

33. The ALJ properly determined that this factor was considered and thus there is no

basis for finding that the ALJ abused his discretion. *See Fogg*, 254 F.3d at 112.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff's Third Claim for Relief is DENIED. The June 1, 2011

Final Order of the Merit Systems Protection Board in *Altamirano v. Chemical Safety*

*Hazard Investigation Board*, R. at 3501-506 is AFFIRMED. It is further

**ORDERED** that the Motion for Leave to File Surreply to Plaintiff's Reply Brief on

Third Claim for Relief [Docket No. 98] filed by defendant Chemical Safety Hazard

Investigation Board is DENIED as moot.

DATED August 15, 2014.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge